# In the United States Court of Federal Claims

No. 13-520T

(E-Filed under Seal:  June 30, 2015)
(Re-issued for Publication:  July 22, 2015)[1]

|  |  |  |
|---|---|---|
| JEFFREY H. GREINER & KIM E. GREINER, | ) ) ) | |
| Plaintiffs, | ) ) | Tax Refund; Merger; Earn-out Right; Earn-out Payments; I.R.C. § 83; Closed Transaction; Burnet v. Logan; |
| v. | ) ) | Open Transaction; I.R.C. § 446(e); Treas. Reg. § 1.446-1(e); Method of |
| THE UNITED STATES, | ) ) | Accounting; I.R.C. § 481 |
| Defendant. | ) ) ) | |

Michael J. Desmond, Santa Barbara, CA, for plaintiffs.

S. Starling Marshall, Trial Attorney, Tax Division, with whom were Caroline D. Ciraolo, Acting Assistant Attorney General, David I. Pincus, Chief, Court of Federal Claims Section, and G. Robson Stewart, Assistant Chief, Court of Federal Claims Section, United States Department of Justice, Washington, D.C., for defendant.

## OPINION AND ORDER

CAMPBELL-SMITH, Chief Judge

Plaintiffs Jeffrey and Kim Greiner seek a refund of $4,742,703 in federal income taxes for the 2008 and 2009 tax years, plus interest and costs.  Compl. ¶¶ 30, 34, ECF No. 1.  This court's jurisdiction over their refund suit is not in dispute, see 28 U.S.C. § 1491(a)(1) (2012); 26 U.S.C. § 7422(a) (2012), and the fundamental issue in this refund suit, as in most, is whether the taxpayers can establish an overpayment of taxes in the years before the court, Lewis v. Reynolds, 284 U.S. 281, 283 ("An overpayment must appear before refund is authorized."), modified on other grounds, 284 U.S. 599 (1932);

---

[1]     This Opinion originally issued under seal.  The parties were provided an opportunity to propose redactions prior to its reissuance for publication.  Neither party proposed redactions.

Fisher v. United States, 80 F.3d 1576, 1579–81 (Fed. Cir. 1996); Dysart v. United States, 340 F.2d 624, 628–29 (Ct. Cl. 1965).

The Greiners filed for summary judgment as to their alleged overpayment.[2]  Pls.' Mot. Summ. J., ECF No. 22; Pls.' Mem., ECF No. 22-1.  The Greiners contend that their original 2008 and 2009 tax returns erroneously classified two cash payments received in those years as compensation income, taxable at ordinary income rates.  Instead, as set forth in their 2008 and 2009 amended returns, the Greiners claim that these amounts were not compensation income, but rather capital gain from the sale or exchange of a capital asset and taxable at preferential long-term capital gain rates.  The Greiners assert a right to refund based on the difference between the higher ordinary income tax they paid under their original returns, and the lower tax for capital gain allegedly owed under their amended returns.

The government opposes their motion and cross-moves for summary judgment raising three defenses.[3]  Def.'s Cross-Mot., ECF No. 25; Def.'s Mem., ECF No. 25-1.  The parties acknowledge that if the government were to prevail on any one of these defenses, the Greiners' refund claims would be resolved without the court having to reach the merits of whether proper reporting reflects ordinary income or capital gain.  See Order, Oct. 16, 2014, ECF No. 21.  Therefore, in the interest of judicial economy and at the parties' urging, the court agreed to delay resolving the Greiners' dispositive motion in order first to consider the three "threshold" defenses raised in the government's dispositive motion.  See id.

First, the government alleges that the Greiners' re-classification of payments from ordinary income to long-term capital gain in their amended 2008 and 2009 returns

---

[2]  In support, the Greiners attach copies of selected statutes, regulations, and other authorities, as well as a Declaration of Jeffrey H. Greiner (Greiner Decl.) dated November 20, 2014 (App. B-1 to B-9) to which is appended fifteen supporting exhibits of merger, tax, and other related documents (App. B-10 to B-392), and a Declaration of Michael J. Desmond (Desmond Decl.) dated November 21, 2014 (App. C-1 to C-2) to which is appended two supporting exhibits (App. C-3 to C-89).

[3]  In support, the government attaches copies of selected statutes, regulations and other authorities (App. A-1 to A-17); a Declaration of Martin H. Montgomery, a Revenue Agent at the Internal Revenue Service, dated January 7, 2015 (App. A-18 to A-20), which includes tax filings, merger documents, and related materials (App. A-21 to A-425); and a Declaration of S. Starling Marshall dated January 7, 2015 (App. A-426 to A-427), which includes a magistrate judge's report and excerpts from the deposition of Mr. Greiner (App. A-428 to A-453).  See also Order, Jan. 14, 2015, ECF No. 27 (granting the government's unopposed motion to replace App. A-335 through A-453 at ECF Nos. 25-7 & -8, with corrected App. A-335 through A-453 at ECF Nos. 26-1 & -2).

reflects a "change in method of accounting" for which permission was required but never obtained, in violation of § 446(e) of the Internal Revenue Code of 1986, as amended (I.R.C. or Code).  Def.'s Mem. 2, 11–17.  Second, the government contends that the change in accounting violates the common-law duty of consistency that the Greiners, as taxpayers, owe the Internal Revenue Service (IRS).  Id. at 2, 17–20.  Third, the government argues that the 2008 and 2009 payments cannot qualify as long-term capital gain, as alleged, because the payments did not result from the "sale or exchange" of a "capital asset" as those terms are defined in Code §§ 1221 and 1222.  Id. at 2, 20–27.

The Greiners respond that the consent requirement imposed by I.R.C. § 446(e) was never triggered because the re-classification of ordinary income to capital gain does not reflect a "change in method of accounting."[4]  Pls.' Opp'n 2–10, ECF No. 28.  Nor does the re-classification violate the duty of consistency.  Id. at 2, 10–16.  The duty only precludes a taxpayer's changes when the changes lead to either a loss to the government or a windfall to the plaintiff, and neither allegedly is present here.  Id.  Lastly, the Greiners contend that the 2008 and 2009 payments qualify for capital gain treatment because they represent the long-term return on an initial investment made by Mr. Greiner, which the Greiners allege was disposed of by sale or exchange in 2007.  Id. at 2–3, 16–25.

The government replies with further support of its summary judgment motion on the three threshold defenses.[5]  Def.'s Reply, ECF No. 30.  In addition to the parties' briefing, the court considers oral argument on the three defenses.  See Tr., Apr. 21, 2015, ECF No. 32.

Because the three defenses are before the court in the posture of summary judgment, the court weighs, with respect to each defense, whether the government is "entitled to judgment as a matter of law" in the absence of a "genuine dispute as to any material fact."  See R. Ct. Fed. Cl. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986); Am. Airlines, Inc. v. United States, 204 F.3d 1103, 1108 (Fed. Cir. 2000).  As the moving party, the government carries the initial burden to set forth a prima facie case for summary judgment in its favor.  See MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp., 420 F.3d 1369, 1373 (Fed. Cir. 2005) (citing Celotex

---

[4]     The Greiner's Opposition, ECF No. 28, includes an IRS Form 3610 Audit Statement in which the IRS sets forth a hypothetical computation of the Greiners' 2004, 2006, and 2007 federal income tax liability under the approach put forth in the Greiners' amended returns for the 2008 and 2009 tax years.

[5]     The government's Reply, ECF No. 30, includes an un-dated Declaration of S. Starling Marshall (App. A-454 to A-455), to which was appended two exhibits—an excerpt from the transcript of Mr. Greiner's deposition, January 27, 2014 (App. A-457–68) and a copy of a trust agreement, dated May 28, 2004 (App. A-470 to A-491).

Corp. v. Catrett, 477 U.S. 317, 322–24 (1986)); Novartis Corp. v. Ben Venue Labs., Inc., 271 F.3d 1043, 1046 (Fed. Cir. 2001) (same).  If the government does so, then the burden shifts to the Greiners to rebut the government's prima facie case or to raise any triable issue of material fact.  See MEMC Elec., 420 F.3d at 1373 (citing Anderson, 477 U.S. at 250); Am. Airlines, 204 F.3d at 1108; Novartis, 271 F.3d at 1046; Fulgoni v. United States, 23 Cl. Ct. 119, 125 (1991).

"Once both parties have sufficiently set forth their respective positions, the court will then inquire—whether [a reasonable trier of fact] could find, on the indisputable facts by a preponderance of the evidence, that that the movant [—here, the government—] has met [its] burden and is entitled to a judgment as a matter of law."  Mulholland v. United States, 25 Cl. Ct. 748, 757 (1992) (citing Anderson, 477 U.S. at 252); Int'l Paper Co. v. United States, 39 Fed. Cl. 478, 483 (1997).  As this is a tax refund suit, the court reviews the facts and law presented by the parties de novo.  Bubble Room, Inc. v. United States, 159 F.3d 553, 561, 563 (Fed. Cir. 1998); Stobie Creek Invs., LLC v. United States, 82 Fed. Cl. 636, 663 (2008), aff'd, 608 F.3d 1366 (Fed. Cir. 2010); D'Avanzo v. United States, 54 Fed. Cl. 183, 186 (2002).

I.      Undisputed Facts

Prior to June 1, 2004, plaintiff Jeffrey Greiner was President of Advanced Bionics Corporation (Advanced Bionics) with broad responsibility for the company's day-to-day operations.  Greiner Decl. ¶ 3, App. B-1.  As part of his compensation package, he received stock options.  Id. ¶¶ 9–14, App. B-2–4.  Pursuant to an Agreement and Plan of Merger (Merger Agreement) effective June 1, 2004, Advanced Bionics became a wholly-owned indirect subsidiary of Boston Scientific Corporation (together with its affiliates, Boston Scientific).  Id. ¶ 4, App. B-1; see also Merger Agt., May 28, 2004, App. A-185–364.  In connection with the merger, all stock options held by Mr. Greiner and others were vested and then cancelled.  See Merger Agt. § 2.06, App. A-202.  In exchange, Mr. Greiner and other option holders had the choice of converting their cancelled holdings to either a one-time cash payment at a rate of $21 per share minus the applicable strike price for each option (the Cash Election), or a one-time cash payment at $11 per share, minus the strike price, plus a contractual "earn-out" right (the Earn-out Election).  Id. §§ 2.06, 2.10, 2.11, App. A-202, 204–09; Greiner Decl. ¶¶ 15–18, App. B-4.

As further explained in a contemporaneous Information Statement,[6] earn-out recipients would be eligible to receive pro rata shares of post-merger payments from

---

[6]     The Information Statement was a forty-page document provided to Advanced Bionics' shareholders and option holders explaining the merger and its risks, potential rewards, and general tax implications.  Info. Statement, June 3, 2004 (2004 Info. Stmt.), App. B-11–54; see also Merger Agt. § 2.09, App. A-205 (directing the creation, content, and dissemination of an information statement).

Boston Scientific to a grantor trust (the Bionics Trust).[7]  See Info. Statement, June 3, 2004 (2004 Info. Stmt.), App. B-25–27; Greiner Decl. ¶¶ 18, 24, App. B-4–5.  Earn-out payments were not guaranteed or fixed, but would be measured by the future performance of four product lines of Advanced Bionics, 2004 Info. Stmt., App. B-17–18, 25–29; Greiner Decl. ¶ 20, App. B-4–5, that were in various stages of development, regulatory approval, and production at the time of the merger, Greiner Dep. 17:23–20:9, Jan. 27, 2014, App. C-71–74.  The payment right would last nine years, from January 1, 2005 through December 31, 2013.  2004 Info. Stmt., App. B-17, 25.  As the companies explained to potential earn-out recipients, "those who choose the Earn out Election" would have "an opportunity to benefit from value that may be created in the future." Id. at B-22.  The earn-out recipients also would accept "material risk," however, that no or very modest earn-out payments would be made if the products failed to achieve significant sales growth or were stymied or slowed by such difficulties as regulatory hurdles, product liability lawsuits, and patent challenges, before the right to earn-out payments expired in 2013.  Id. at B-18, 39–44.

A.      Tax Year 2004:  Earn-out Election & Federal Reporting

Mr. Greiner chose the Earn-out Election.  See Greiner Decl. ¶ 21, App. B-5.  His options to acquire one million shares of Advanced Bionics stock were cancelled and converted to a cash payment of just over $10 million.[8]  Id. ¶¶ 15, 22, App. B-4–5.  He also received the earn-out right, entitling him to receive a pro rata share of the future contingent earn-out payments from Boston Scientific from January 1, 2005 through December 31, 2013.  Id. ¶ 23, App. B-5.

Boston Scientific reported the cash component as gross pay on Mr. Greiner's 2004 IRS Form W-2, App. A-31, and the Greiners reported the cash as ordinary compensation income on their 2004 joint federal income tax return, App. A-22–31; see also Greiner

---

[7]      Based on the large number of people entitled to receive these payments, a grantor trust (the Bionics Trust) was established to administer the funds.  See 2004 Info. Stmt., App. B-33; Merger Agt. § 2.11, App. A-207–09; Greiner Decl. ¶ 24, App. B-5.  For federal tax purposes, however, the Bionics Trust was disregarded and its owners (including Mr. Greiner) were treated as holding the earn-out rights directly.  See 2007 Info. Stmt., App. B-305; see generally Treas. Reg. (26 C.F.R.) § 1.671-1 (grantors treated as owners); Id. § 1.671-2 (grantors report all items of income, deduction, and credit of the grantor trust); Sun First Nat'l Bank v. United States, 221 Ct. Cl. 469, 477–78 (1979) (explaining application of the grantor tax rules under federal tax law).

[8]      Following the merger, Mr. Greiner became an employee of Boston Scientific. Greiner Decl. ¶ 8, B-2.

Decl. ¶ 29, App. B-6.[9]  The fair market value of the earn-out right, however, was not reported by Boston Scientific on Mr. Greiner's W-2, nor by the Greiners on their 2004 income tax return.  Greiner Decl. ¶ 30, App. B-6.

This was consistent with a determination by Advanced Bionics and Boston Scientific to treat the grant of the earn-out right as not immediately subject to tax in 2004. See 2004 Info. Stmt., App. B-48–49.  The parties would report ordinary income on the earn-out right only when later receiving earn-out payments.  Id. at B-48.  The companies shared their view with potential earn-out recipients prior to their election:

> The tax consequences to an Option holder who exchanges such Options in the Merger for the Earn Out Consideration are [sic] not entirely clear. Advanced Bionics and Boston Scientific intend to take the position that an Option holder who exchanges such options in the Merger for the Earn Out Consideration will have compensation income at the time of the Merger equal to the amount of cash consideration received at the time of the Merger, which will be net of the applicable exercise price.  In addition, all of the earn-out payments will be treated as compensation income at the time those payments are received.  Any amounts treated as compensation income are subject to tax at ordinary income tax rates and are subject to applicable employment and withholding taxes.

Id.; see also Greiner Decl. ¶¶ 27–28, B-6.  This delayed reporting reflects an "open" transaction approach, which taxpayers may use when it is not possible to determine with "fair certainty" the fair market value of a contract for future payments of money.  See Burnet v. Logan, 283 U.S. 404, 412–13 (1931) (authorizing the "open" transaction approach when something received has "no ascertainable fair market value" at the time of receipt).  In this case, the companies determined that the value of Advanced Bionics as a whole—and the value of the earn-out right specifically—were too speculative in 2004 to assign them a fair market value.  The Information Statement explained:  "The aggregate purchase price for Advanced Bionics cannot be precisely determined because it depends on the value of the contingent earn-out payments, which are based on Advanced Bionics' future net-sales growth and gross margin."  App. B-24.  The "future net-sales growth and gross margin," in turn, was subject to material risks of slow growth or failure given that the products were still in various stages of development, testing, approval, and marketing. See id. at B-18, 39–44.

---

[9]     In each of the 2004 through 2009 tax years, Jeffrey Greiner and Kim Greiner filed joint U.S. Individual Income Tax Returns (IRS Forms 1040).  Greiner Decl. ¶ 2, App. B-1.

However, the companies also acknowledged uncertainty regarding tax reporting obligations and advised earn-out recipients to seek independent tax advice:[10]

> Although Advanced Bionics and Boston Scientific intend to treat all of the amounts paid to holders who elect the Earn Out Consideration as compensation, there are other alternative treatments that could apply. **The Option holders who exchange their options in the Merger for the Earn Out Consideration should consult their own tax advisors regarding the specific federal, state, local and foreign tax consequences to them of the Merger.**

Id. at B-48–9.

B.     Tax Years 2005–2007:  Earn-out Payments & Federal Reporting

No earn-out payments were made by Boston Scientific in 2005.  Greiner Decl. ¶ 31, App. B-6.  In 2006 and 2007, Boston Scientific did make earn-out payments and Mr. Greiner's pro rata shares were $6,579,031.28 in 2006 and $4,628,696.35 in 2007.  Id. ¶¶ 32–33, App. B-6–7.  Consistent with the open transaction approach outlined in the 2004 Information Statement, Boston Scientific reflected these payments as gross pay on Mr. Greiners' Earnings Statements and Forms W-2 in each of those years.  Earnings Stmt., Dec. 29, 2006, App. B-213; Earnings Stmt., Dec. 28, 2007, App. B-215; Form W-2 (2006), App. A-45; Form W-2 (2007), App. A-78; see also Greiner Decl. ¶¶ 32–33, App. B-6-7.  Likewise, the Greiners reported their receipt of the earn-out payments among their ordinary compensation income on their 2006 and 2007 tax returns.  See Am. Return (2006), App. A-33–45; Am. Return (2007), App. A-47–78; Greiner Decl. ¶¶ 32–33, App. B-6-7.

C.     Tax Years 2008 & 2009:  Final Payments & Original Federal Reporting

In January 2008, Mr. Greiner and other earn-out recipients settled litigation with Boston Scientific that been pending since 2006, which concerned post-merger

---

[10]    The Greiners' briefing implies that Boston Scientific acted alone in adopting the open transaction approach and informing option holders.  See Pls.' Mem. 9–10.  This is plainly belied by the 2004 Information Statement, which explained the merger to potential earn-out recipients, stating:  "Advanced Bionics and Boston Scientific intend to take the position . . . ."  App. B-48 (emphasis added).  Mr. Greiner held the position of President of Advanced Bionics during the merger.  Greiner Decl. ¶ 3, App. B-1.

management and control of the Advanced Bionics business.[11]  Greiner Decl. ¶¶ 34–35, App. B-7; see Stip. Dismissal, Woods v. Boston Scientific Corp., No. 06-cv-5380 (AKH) (S.D.N.Y. Jan. 9, 2008); Settlement Agt., Jan. 3, 2008, App. B-217–230.  Pursuant to the settlement, the parties agreed to amend the 2004 Merger Agreement to provide, in relevant part, for an early end to the earn-out payments and the de-merger of the companies.[12]  Info. Statement, Sept. 4, 2007 (2007 Info. Stmt.), App. B-232–313; see generally Amend. Agreement, Aug. 9, 2007, App. A-366–95 (providing that the Merger Agreement will be amended by a First Amendment to be followed by a Second Amendment); Amendment No. 1, Aug. 9, 2007, App. A-397–414; Amendment No. 2, Aug. 9, 2007, App. A-416–425.  With respect to the earn-out right, Boston Scientific agreed to "pay the Bionics Trust $1.15 billion in two installments (. . . the 'earn out buyout') in full satisfaction of all earn out obligations under the Merger Agreement, and to otherwise terminate most of the other outstanding obligations of the parties under the merger agreement." 2007 Info. Stmt., App. B-239.  Unlike the earlier earn-out payments, this "earn-out buyout" consideration would be in fixed installment amounts not contingent upon, and regardless of, the future sales of the Advanced Bionics products. Id. at B-240, 246.  "After the second payment . . . Boston Scientific [would] not make any more earn out payments . . . ." Id. at B-247.  The amendment "terminate[d] the performance-based earn out payments" that would have otherwise remained payable from 2008 through 2013. Id. at B-245.  The earn-out recipients were therefore "los[ing] all rights" to continued receipt of earn-out payments through 2013 and would "have only the right to receive [his or her] pro rata portion of the earn-out buyout consideration." Id. at B-301.  This "earn-out buyout" consideration was described by the parties as a "material inducement causing [the earn-out recipients] to enter [settlement]."  Settlement Agt. § 1.01(c), App. B-220.

Boston Scientific paid the Bionics Trust the first installment of $650 million in February 2008 and the second installment of $500 million in March 2009.  Greiner Decl. ¶ 28, App. B-7–8.  Mr. Greiner's pro rata share of the 2008 installment was paid in February 2008 in the amount of $15,062,420.35, and his pro rata share of the 2009

---

[11]     For the substance of the dispute, see Stip. Dismissal, Woods v. Boston Scientific Corp., No. 06-cv-5380 (AKH) (S.D.N.Y. Jan. 9, 2008).  Previously, the district court entered a permanent injunction based on Boston's Scientific's breach of the Merger Agreement with Advanced Bionics, and bad faith.  Permanent Inj., Woods, No. 06 Civ. 5380 (AKH), 2007 WL 1202266 (S.D.N.Y. Apr. 23, 2007), aff'd in part, vacated in part, 246 F. App'x 55 (2d Cir. 2007).

[12]     Prior to the settlement, a seventy-five page Information Statement was issued by the Stockholders' Representative and Trustees of the Bionics Trust to earn-out recipients, and explained the risks, rewards, and general tax treatment of the settlement.  Information Statement, Sept. 4, 2007 (2007 Info. Stmt.), App. B-232–313.

installment was paid in March 2009 in the amount of $11,592,809.  Greiner Decl. ¶¶ 39, 40, App. B-9.

Still consistent with the open transaction approach outlined in the 2004 Information Statement, Boston Scientific categorized Mr. Greiner's 2008 and 2009 payments (the final payments) as gross pay on Mr. Greiner's Earning Statements under the descriptive "Stk [Stock] Earn Out."  See id.; Earnings Stmt., Feb. 29, 2008, App. B-315.  In turn, the Greiners reported receipt of their 2008 and 2009 final payments as ordinary compensation income on their original joint federal tax returns for the 2008 and 2009 tax years, respectively.  Greiner Decl. ¶ 41, App. B-8; see Original Return (2008), App. A-80–97; Original Return (2009), App. A-99–118.

The Greiners' reporting of these final payments as ordinary compensation income was also consistent with the 2007 Information Statement regarding settlement and de-merger of the companies.  See generally App. B-232–313.  In that statement, Boston Scientific informed earn-out recipients that it intended to "recognize ordinary compensation income equal to [the earn-out recipient's pro rata] share of any cash payments to be [paid to] the Bionics Trust in 2008 and 2009 in connection with the amendment agreement."  App. B-309.  Moreover, unlike the 2004 Information Statement regarding the earlier merger, no uncertainty was expressed with regard to treating the 2008 and 2009 final payments as ordinary compensation income.  See id.  The only uncertainty expressed in the 2007 Information Statement was whether earn-out recipients needed to report the value of the 2009 payment in 2008 because its amount was then fixed and known, or whether reporting of the 2009 payment could wait until receipt of the funds in 2009.  See id.  Taxpayers were reminded to consult their own tax advisers.  Id. at B-305.

D.     Amended Returns for Tax Years 2008 & 2009

In June 2011, the Greiners filed amended joint returns for the 2008 and 2009 tax years seeking a refund of $2,553,427 for 2008 and $2,189,276 for 2009 (collectively, $4,742,703).  Am. Return (2008), App. B-317–351; Am. Return (2009), App. B-352–389; see Greiner Decl. ¶¶ 42, 44, App. B-8 (explaining same).  The amended returns re-classified the 2008 and 2009 final payments from Line 7 (Wages, Salaries, Tips, etc.) income as originally reported, to Line 13 (capital gain) income on the amended returns.  See Am. Return (2008), App. B-319, 328, 341; Am. Return (2009), App. B-355, 364, 370, 385; see Greiner Decl. ¶¶ 43, 45, App. B-8–9.

In the narrative statements appended to each amended return, the Greiners explained that they were seeking to amend the manner in which they originally reported both the 2004 earn-out right and the 2008 and 2009 payments.  See id. at B-348–51, 386–89.  The Greiners claimed that they erred in failing to include the earn-out right among their income on their 2004 original return.  See id. at B-349, 387.  They further suggested that this error was the result of their having followed poor advice or direction from

Boston Scientific.  Id.  But see supra note 10.  Rather, they allegedly could have, and should have, ascertained the fair market value of the earn-out right in 2004, reported it that year as ordinary compensation income, and been immediately taxed on it.  Id. at B-348–50, 386–88.  After doing so, they would have held a "capital asset" as broadly defined in Code § 1221.  Id. at B-350, 388.  Subsequent earn-out payments in 2006 and 2007 would still have been taxable as ordinary income (after a return of basis).  Id. at B-351, 389.  However, the 2008 and 2009 final payments—originally reported as ordinary compensation income—allegedly should have been reported as long-term capital gain.  Id.  The Greiners claimed that these final payments were entitled to different treatment because they purportedly resulted from the sale or exchange of a capital asset—specifically, Boston Scientific's early "earn-out buy-out."  Id. at B-350–51, 388–89.  The claimed refunds were the difference between the taxes originally paid at higher ordinary income rates, and the taxes allegedly owed under the lower preferential long-term capital gain rates.[13]  See id. at 351, 389.

The IRS did not take final action on the Greiners' claims for refund, see Greiner Decl. ¶ 46, App. B-9, and this tax refund litigation ensued.

## II.    Analysis

The Greiners will be entitled to tax refunds only if the 2008 and 2009 final payments may be recast as taxable at preferential long-term capital gain rates rather than at higher ordinary income rates.  This depends, first and foremost, on whether Mr. Greiner's receipt of the original earn-out right in 2004 was properly an "open" transaction as originally reported,[14] or rather a "closed" transaction as argued by the

---

[13]    For the 2008 and 2009 tax years, the maximum federal rate for most long-term capital gains was 15 percent.  I.R.C. § 1(h)(1)(C) (2006).  In contrast, the maximum federal tax rate for individuals on ordinary income was 39.6 percent.  See I.R.C. § 1(a)–(e) (tax tables).

[14]    In Burnet v. Logan, the Supreme Court recognized a taxpayer's right to delay income reporting, under the "open" transaction approach, when the fair market value of a contract right to receive future payments is not ascertainable.  283 U.S. 404, 412–13 (1931).  "Open transaction treatment," as the government further explains, "means that no amount is reported as income until either (i) payment is actually received (cash method taxpayers), or (ii) all events occur which fix the right to receive the payment and the amount can be determined with reasonable accuracy (accrual method taxpayers)."  Def.'s Mem. 13 n.13.  "Apart from imputed interest, amounts are applied first against asset basis, deferring income recognition until all of that basis has been recovered."  Id.  "In this case, plaintiffs' basis in their earn-out rights was zero."  Id.

amended returns. [15]  Pls.' Mem. 1, 11.  If it should have been a closed transaction, then a second question arises whether the 2008 and 2009 final payments were ordinary income like the earlier 2006 and 2007 earn-out payments, or were long-term capital gain from the sale or exchange of a capital asset.  Id. at 1, 11–12.

The Greiners contend in their amended returns, and in this litigation, that the estimated fair market value of the earn-out right was ascertainable in 2004; thus, they should have reported it in 2004 as ordinary income from a closed transaction.  Id. at 18–20.  After doing so, the Greiners arguably would have held a capital asset that, if sold or exchanged in 2007, would have triggered long-term capital gains (not ordinary compensation income).  Id. at 20–30; Pls.' Opp'n 2–3, 16–25.  The government responds that the open approach taken by the Greiners on their original returns was not improper.  See Def.'s Mem. 8 n.7.  In any event, having made an open transaction election in 2004, the Greiners were bound to report the subsequent earn-out payments as ordinary income when received in 2006, 2007, 2008 and 2009.  See generally Def.'s Mem. 1–2, 11–20, 27–38.  In the alternative, the 2008 and 2009 final payments were not capital gain from the "sale or exchange" of a "capital asset" taxable at preferential rates, but were, instead, merely escalated earn-out payments subject to ordinary income tax.  Id. at 20–28.

At this time, however, the court need not resolve how the Greiners should have reported their earn-out income.  As earlier explained, the parties agree that resolution of this issue can wait until the court addresses the government's potentially dispositive "threshold" defenses.  Seeking summary judgment, the government argues:  (1) the Greiners' refund claims are premised on a change in method of accounting for which IRS consent was required but not obtained; (2) the Greiners' refund claims violate their duty of consistency to the IRS; and (3) the 2008 and 2009 final payments are taxable as ordinary income, not as long-term capital gains—regardless of an "open" or a "closed"

---

[15]    Section 83(a), I.R.C., requires immediate reporting of income, under the "closed" transaction approach, when a taxpayer receives property for services and that property has an ascertainable fair market value.  It obligates a taxpayer, who performs services in return for property, to report gross income equal to "(1) the fair market value of such property . . . at the first time the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture, whichever occurs earlier, over (2) the amount (if any) paid for such property."  I.R.C. § 83(a).  As the government further explains, if that right or property subsequently generates income, the income is treated initially as a tax-free recovery of basis.  Def.'s Mem. 13 n.14.  "After that basis has been fully recovered, any additional amounts received by the taxpayer are reported as ordinary income" unless or until the right or property expires or is disposed of by "'sale or exchange.'"  Id.  If disposed by "sale or exchange," the taxpayer reports capital gain rather than ordinary income.  See I.R.C. §§ 1001, 1221, 1222.

approach to the 2004 earn-out right—because those final payments did not result from the "sale or exchange" of a "capital asset." Def.'s Mem. 2.

A.      Change in Accounting Method

The government has moved for summary judgment asserting that the Greiners attempted to change their method of accounting for the earn-out right and its subsequent earn-out payments without having properly requested or obtained IRS consent. Def.'s Mem. 1–2, 11–17; Def.'s Reply 5–11. The court agrees that the Greiners failed to obtain the required consent to change from an open transaction method of accounting to a closed transaction method of accounting for the earn-out right and subsequent payments. For this reason, the court need not reach the subordinate question of whether the Greiners' shift from reporting the 2008 and 2009 payments as ordinary income to capital gain was an impermissible change in method of accounting, or was a permissible form of reporting based on a change in the underlying facts.

The Internal Revenue Code affords a taxpayer some discretion in choosing—from the permissible options—its method of accounting. I.R.C. § 446(c). But once a method is selected, the taxpayer must use the same method to compute its taxable income as the taxpayer regularly uses to compute income in keeping its books. Id. § 446(a). The taxpayer also must maintain its accounting approach consistently from year to year. See Treas. Reg. § 1.446-1(a)(2). To change accounting methods, the taxpayer "shall, before computing his taxable income under the new method, secure the consent of the [IRS]." I.R.C. § 446(e). To secure consent, the taxpayer must file with the IRS a Form 3115 (Application for Change in Accounting Method) during the taxable year in which it desires to make the proposed change. Treas. Reg. § 1.446-1(e)(3)(i). In the form, the taxpayer must specify "all classes of items that will be treated differently under the new method of accounting." Id.

Consent is required for changes from one permissible method to another, but also for changes from an impermissible method to a permissible one.[16] Treas. Reg. §§ 1.446-1(e)(2)(i) and (iii) (Examples (1), (6), (7), and (8)); Diebold, Inc. v. United States, 16 Cl. Ct. 193, 202 aff'd, 891 F.2d 1579, 1583 (Fed. Cir. 1989); accord Capital One Fin. Corp. v. Comm'r, 659 F.3d 316, 323 (4th Cir. 2011) (discussing the Federal Circuit's decision

---

[16]      Consent is required for "good reason" even in the circumstance of a switch from an impermissible to a permissible method. Capital One Fin. Corp. v. Comm'r, 659 F.3d 316, 323 (4th Cir. 2011). "What is permissible or impermissible will often be a matter of interpretation or dispute as to which the taxpayer cannot arrogate to itself the right to make a unilateral determination." Id. "[T]he consent rules have equal 'vitality' when the change in method is from an impermissible to a permissible one for the 'danger of distortion of income detrimental to governmental revenues exists regardless.'" Id. (quoting Witte v. Comm'r, 513 F.2d 391, 394 (D.C. Cir. 1975)).

in Diebold, 891 F.2d at 1583).  As explained by our predecessor Claims Court, "the language of § 446(e) [—the tax code provisions addressing general methods of accounting—], the regulations clarifying § 446(e), the case law interpreting § 446(e) in six circuits, the statutory history of § 446(e) and its predecessors in earlier versions of the Code, as well as the legislative history accompanying § 446(e)'s enactment, separately and cumulatively establish that a taxpayer may not change from an incorrect to a correct accounting method without the Commissioner's consent." Diebold, 16 Cl. Ct. at 202 (interpreting the 1954 Code); accord Witte v. Comm'r, 513 F.2d 391, 391 (D.C. Cir. 1975) (requiring "approval of changes in accounting methods even when the taxpayer proposes to adopt the only correct method"); H.F. Campbell Co. v. Comm'r, 53 T.C. 439, 447 (1969) ("For the purposes of . . . section 446, the term 'method of accounting' includes the consistent treatment of a recurring, material item, whether that treatment be correct or incorrect."), aff'd, 443 F.2d 965 (6th Cir. 1971).

Accordingly, "[i]n a case in which the taxpayer does not first obtain the [IRS] Commissioner's consent, such as where the taxpayer attempts in a court proceeding to retroactively alter the manner in which the taxpayer accounted for an item on its tax return, the question is whether the change constitutes a change of accounting method that is subject to section 446(e)." Capital One Fin. Corp. v. Comm'r, 130 T.C. 147, 156 (2008) (citing authorities), aff'd, 659 F.3d 316 (4th Cir. 2011).  And, if so, "then the taxpayer is foreclosed from making the change by section 446(e) and the regulations promulgated thereunder without regard to whether the new method would be proper." Id. (emphasis added).

Neither the Code nor Treasury Regulations explicitly define the terms "method" or "accounting." See Treas. Reg. § 1.446-1(c) (providing a non-exhaustive list of permissible accounting methods).  In layman's terms, a "method" is "[a] means or manner of procedure, especially a regular and systemic way of accomplishing something." American Heritage Dictionary 1105 (4th ed. 2000).  In this case, that "something" is "accounting," defined as the "making [of] a financial record of business transactions and in the preparation of statements concerning the assets, liabilities, and operating results of a business." See id. at 12.  Similarly, in general legal terms, an "accounting method" is "[a] system for determining income and expenses, profit and loss, asset value, appreciation and depreciation, and the like, esp[ecially] for tax purposes." Black's Law Dictionary 24 (10th ed. 2014); accord Def.'s Mem. 11 ("Methods of accounting determine when a taxpayer takes items of income or deduction into account.")

Treasury Regulation § 1.446-1, however, does "provide[] both inclusive and exclusive rules for determining when a 'change in method of accounting' has occurred." Huffman v. Comm'r, 518 F.3d 357, 364 (6th Cir. 2008), aff'g 126 T.C. 322, 340 (2006). Inclusively, a "method of accounting" refers not only to the taxpayer's "overall plan of accounting for gross income or deductions"—such as the cash receipts and disbursements method or the accrual method—but also "the treatment of any material item used in such

overall plan." Treas. Reg. § 1.446-1(e)(2)(ii)(a). "A material item is any item that involves the proper time for the inclusion of the item in income or the taking of a deduction." Id. § 1.446-1(e)(2)(ii)(a) (emphasis added); Diebold, 16 Cl. Ct. at 198–99. Stated another way, "consistency in matters of timing defines a method of accounting." Huffman, 126 T.C. at 347; Knight-Ridder Newspapers, Inc. v. United States, 743 F.2d 781, 797–98 (11th Cir. 1984) ("The essential characteristic of a 'material item' is that it determines the timing of income or deductions."); Gen. Motors Corp. v. Comm'r, 112 T.C. 270, 296 (1999) ("An accounting practice that involves the timing of when an item is included in income or when it is deducted is considered a method of accounting.").[17]

The adoption of a "method" generally is manifested by its first use on a filed return. See Treas. Reg. § 1.446-1(e)(1) (first sentence); see also id. § 1.446-1(b)(2) ("Tax returns, copies thereof, or other records, may be sufficient to establish the use of the method of accounting used in the preparation of the taxpayer's income tax returns."). Moreover, "[a]lthough a method of accounting may exist . . . without . . . a pattern of consistent treatment of an item, in most instances a method of accounting is not established for an item without such consistent treatment." Id. § 1.446-1(e)(2)(ii)(a). In practice, the use of a proper method of accounting on a single return has been recognized to constitute the adoption of that method for tax purposes. See Pacific Nat'l Co. v. Welch, 304 U.S. 191, 193–95 (1938). In contrast, the use of an improper method only constitutes the adoption of a method if used on at least two consecutive returns. Johnson v. Comm'r, 108 T.C. 448, 494 (1997) (discussing the adoption of a method of accounting in the context of I.R.C. § 481, which works in tandem with § 446(e)), aff'd in part, rev'd in part, 184 F.3d 786 (8th Cir. 1999); accord Rev. Proc. 08-52, § 2.01(2), 2008-36 I.R.B. 587.

The regulations also provide certain rules of exclusion. See Huffman, 126 T.C. at 340. First, "[a] change in method of accounting does not include correction of mathematical or posting errors, or errors in the computation of tax liability (such as errors in computation of the foreign tax credit, net operating loss, percentage depletion, or investment credit)." Treas. Reg. § 1.446-1(e)(2)(ii)(b); see I.R.C. § 6213(g)(2)(A)–(C) (defining a "mathematical or clerical error" as, inter alia, "an error in addition, subtraction, multiplication, or division," "an incorrect use of any [IRS] table," or "an entry on a return of an item which is inconsistent with another entry of the same or another item on such return"); Wayne Bolt & Nut Co. v. Comm'r, 93 T.C. 500, 510–11

---

[17]     "If the accounting practice does not permanently affect the taxpayer's lifetime taxable income, but does or could change the tax year in which taxable income is reported, it involves timing and is therefore considered a method of accounting." Rev. Rev. Proc. 91-31, § 3.02, 1991-1 C.B. 566 (citing Knight-Ridder Newspapers, Inc. v. United States, 743 F.2d 781, 799 (11th Cir. 1984); see also Peoples Bank & Trust Co. v. Comm'r, 415 F.2d 1341, 1344 (7th Cir. 1969)).

(1989) (defining a "posting error" as an error in "the act of transferring an original entry to a ledger" (quoting Black's Law Dictionary 1050 (5th ed. 1979))).

Second, "a change in method of accounting does not include adjustment of any item of income or deduction that does not involve the proper time for the inclusion of the item of income or the taking of a deduction." Treas. Reg. § 1.446-1(e)(2)(ii)(b).  For example, corrections of "items that are deducted as interest or salary, but that are in fact payments of dividends, and of items that are deducted as business expenses, but that are in fact personal expenses, are not changes in method of accounting." Id.

Third, "[a] change in method of accounting also does not include a change in treatment resulting from a change in underlying facts." Id.  In one example provided by the regulations, a taxpayer in the wholesale dry goods business, using the accrual method of accounting, deducts vacation pay in the year in which it was paid because the vacation pay plan was not completely vested. Treas. Reg. § 1.446-1(e)(2)(iii) (Example 3).  If the taxpayer subsequently adopts a completely vested vacation pay plan, and changes the deduction from the year paid to the year liability arises, there has been no change in method of accounting because of the underlying change in facts. Id.  In effect, the "taxpayer continues to apply its existing method of accounting to a change in business practices, a change in economic or legal relationships, or an otherwise altered fact situation." I.R.S. Field Serv. Advice 200004004 (Jan. 28, 2000) (discussing example). "[T]he different tax consequences [arise] from a different legal obligation and economic condition, not from a change in method of reporting." Id.

As an initial matter, the court notes that a number of authorities have recognized that open and closed transaction approaches determine methods of accounting.  Although these authorities are not binding on this court, they do offer persuasive guidance.  For example, in Witte v. Commissioner, the District of Columbia Circuit held that a taxpayer's proposed change from a cost recovery method to a completed transaction method for reporting gain from the sale of real estate was a change in method of accounting requiring consent. 513 F.2d 391, 393 (D.C. Cir. 1975).  The "proposed shift to completed transaction treatment," the Circuit reasoned, "'involve[d] the proper time for the inclusion of the item in income' and thereby satisf[ied] the definition of 'material item' set forth in the regulation." Id. (quoting Treas. Reg. § 1.446-1(e)(2)(ii)(a)). "Accordingly, the threshold requirement for the applicability of the consent provision [was] met." Id.

Similarly, in Wiggins v. Commissioner, the Tax Court described the open transaction approach, working in tandem with the cost recovery method, as a valid method of accounting when the fair market value of property received could not be determined. 72 T.C. 701, 708 (1979).  In such circumstances, "the transaction remains open for Federal income tax purposes and the taxpayer is entitled to report his gain under the cost recovery method." Id.  "Under this method of accounting, the payments received

are applied first toward recovery of basis and then as taxable gain." Id. (citing Burnet v. Logan, 283 U.S. 404 (1931); McShain v. Comm'r, 71 T.C. 998 (1979)).

Likewise, in Estate of O'Leary v. Commissioner, a memorandum opinion,[18] the Tax Court further expounded that the "open transaction doctrine," first enunciated by the Supreme Court in Burnet v. Logan, 283 U.S. 404 (1931), was a "method of accounting for tax purposes, which has come to be known as the cost-recovery or deferred-payment method." T.C. Memo. 1986-212 (1986). This approach also could be contrasted with the closed transaction method of accounting applicable when the fair market value of an obligation can be established upon receipt of the obligation and thus, is deemed the equivalent of cash. Id. (citing cases).

Having considered these authorities, the court sees no reason to find any differently here. As the government points out, the Greiners' change in position on their 2008 and 2009 amended returns, premised on a switch from open to closed transaction reporting, constituted a change in the method they used to account for—not just the 2008 and 2009 payments—but also the earn-out right going back to 2004. Def.'s Mem. 11.

In 2004, the Greiners faced a choice: (1) report their earn-out income as payments that were actually received under the open transaction principles of Burnet v. Logan, 283 U.S. 404 (1931); or (2) report earn-out income under the normal closed transaction rule by estimating and reporting the fair market value of the earn-out right they received in 2004 (purportedly $10 million per plaintiffs' amended returns), see I.R.C. § 83(a). Def.'s Mem. 13. Consistent with Boston Scientific and Advanced Bionics' intention to include the payments as deductible expenses only when those payments were actually made, the Greiners chose the first option—open transaction. Id. at 13–14; see Compl. ¶ 12. They did not report an estimated fair market value of the earn-out right in 2004, but rather reported income associated with the earn-out right only when and as the cash was received in later years: first $6,579,031 in 2006; then $4,628,596 in 2007; then $15,062,420 in 2008; and finally $11,592,809 in 2009. Def.'s Mem. 14. Moreover, the Greiners maintained this approach in their bookkeeping over a period of six years (tax years 2004–2009), and manifested it by abstaining from reporting in 2004 and affirmatively reporting in 2006, 2007, 2008, and 2009. See id. As explained above, the hallmark of a method of accounting is the timing of income or deduction of a material item for reporting, and in this case the open transaction approach plainly directed the timing of income on the Greiners' tax returns. As such, the open transaction approach

---

[18]   The Tax Court's memorandum opinions are not binding precedent on the courts. See Bergdale v. Comm'r, 108 T.C.M. (CCH) 95, at *5 n.5 (2014) (citing multiple authorities); Huffman v. Comm'r, 126 T.C. 322, 350 (2006), aff'd, 518 F.3d 357 (6th Cir. 2008); Kenseth v. Comm'r, 114 T.C. 399, 428 (2000).

was a method of accounting. Having adopted that approach in 2004, the Greiners were obligated to maintain it absent the IRS's consent to a change. See I.R.C. § 446(e).

So, too, the closed transaction approach—proposed by the Greiners in their amended returns and in this litigation—was a method of accounting. Under the closed approach, the Greiners would have reported ordinary income equal to an estimated fair market value of the earn-out right in 2004 (purportedly $10 million), even though no cash was actually received at that time. In turn, the 2006 earn-out payment ($6,579,031) would have been entirely a return of basis against the $10 million. The 2007 earn-out payment would have been a return of basis in part ($3,420,969), plus ordinary income in part ($1,207,627). The 2008 and 2009 payments (respectively, $15,062,420 and $11,592,809) would have been ordinary income or capital gain. The hallmark of this closed transaction method of accounting is, like the open transaction method, the timing of income generated by the earn-out right.

The Greiners' proposed shift from open to closed method reflects a "change" in method of accounting, as evidenced by the differences in the timing of income under the two approaches in 2004, 2006, and 2007:

Table 1:

| Tax Year | Open Transaction (original returns) | Closed Transaction (see amended returns) |
|---|---|---|
| 2004 | no payments received; no income reported | $10,000,000 in ordinary income |
| 2005 | no payments received; no income reported | no payments received; no income reported |
| 2006 | $6,579,031 in ordinary income reported | (tax-free basis recovery of $6,579,031) |
| 2007 | $4,628,596 in ordinary income reported | $1,207,627 in ordinary income reported (+ tax-free basis of recovery of $3,420,969) |
| 2008 | $15,062,420 in ordinary income reported | $15,062,420 in capital gain [or ordinary income] |
| 2009 | $11,592,809 in ordinary income reported | $11,592,809 in capital gain [or ordinary income] |
| Total: | $37,862,956 | $37,862,956 |

The aggregate amount of income reportable by the Greiners under either the open or closed transaction approach would have been the same ($37,862,956.00), provided we accept plaintiffs' $10 million valuation for purposes of summary judgment. Def.'s Mem. 14. The approaches vary, however, in the timing of that income for reporting purposes

and, as the government correctly points out, claims that affect timing reflect a change in method of accounting.  Id. at 15 (citing Hospital Servs. Ass'n of Ne. Pa. v. United States, 78 Fed. Cl. 434, 441 (2007)).[19]  This is true regardless of whether the Greiners' original decision to report the transaction as open in 2004 was right or wrong.  See Treas. Reg. § 1.446-1(e)(2)(i) (second sentence).

Because shifting from an open transaction approach to a closed transaction approach clearly involves differing times for the proper reporting of income associated with the earn-out right, the Greiners' amended returns purported to change accounting method.  Therefore, the government has satisfied the threshold requirements for the application of the consent rule.

The burden shifts to the Greiners to rebut these findings or to raise a triable material fact.  In response, the Greiners assert that their amended returns fit within exceptions to § 446(e) on four grounds:  (1) they merely sought to "correct" their original reporting; (2) there was no "change in method" because there was no inconsistent reporting of a "specific material item;" (3) there was no change in the tax year of the 2008 and 2009 final payments they seek to re-classify and thus, no effect on the timing of that income; and (4) their proposed shift in approach results from a change in underlying facts.  Pls.' Opp'n 3–10.  Lastly, the Greiners contend that their amended returns do not conflict with the public policy behind the consent rule.  Id. at 9.

The Greiners argue, first, that they "seek only to correct their original reporting of the [2008 and 2009 final payments], properly apply the tax law to those payments, and pay only the tax that is legally due and owing."  Pls.' Opp'n 1.  True or not, this is irrelevant for purposes of a § 446 analysis.  While "correction[s] of mathematical or posting errors" do not constitute a "change in method of accounting," Treas. Reg. § 1.446-1(e)(2)(ii)(b), the Greiners proposed retroactive change does not merely correct an error in mathematical operation, see I.R.C. § 6213(g)(2) (defining "mathematical or clerical error").  Nor does their proposed change correct a mistake in transferring an entry from or to a ledger.  See Wayne Bolt & Nut, 93 T.C. at 510–11 (defining "posting error").

In addition, although at least one authority declined to enforce the consent requirement on a taxpayer who sought to correct a prior inadvertent misapplication or

---

[19]    Cf. Knight-Ridder, 743 F.2d at 798 (discussing a change in the treatment of a material item when a taxpayer shifts from deducting dividends when paid to deducting them in the year they are declared (citing Comm'r v. O. Liquidating Corp., 292 F.2d 225 (3d Cir. 1961), cert. denied, 368 U.S. 898 (1961)); Huffman, 126 T.C. at 348, 355 (holding that adjustments to inventories that altered the distribution of a lifetime income among taxable periods constitutes a change in the taxpayers' method of accounting from an impermissible method to a permissible one).

election of an accounting method, see Evans v. Comm'r, T.C. Memo. 1988-228 (1988), there is simply no evidence to support such leniency here. In Evans, the taxpayers argued that, for three years, they had inadvertently reported their employment bonuses in the year in which the bonuses were authorized rather than in the year in which they were received. Therefore, they further argued, there was no change in accounting method when, in the fourth and fifth years, they merely changed their practice of reporting bonuses from the year authorized to the year received. The Tax Court agreed. The taxpayers had not changed their method of accounting within the meaning of § 446(e) because they had never intended to adopt the original method and, in their amended returns, merely corrected inadvertent errors analogous to posting errors. One of the plaintiffs also was an un-sophisticated taxpayer who apparently "knew little of the financial aspects of the company business." He had "merely acquiesced in reporting the bonus income in the year it was reported on the Form 1099 issued to him by the company's bookkeeper, rather than consciously adopting a new form of accounting." Further, the bonus income was reported differently than all other forms of income and expenses. Notably, Evans is not only a memorandum opinion, but one whose merit has been called into question for being in seeming conflict with an example in the regulations interpreting I.R.C. § 481 (a statutory provision that works in tandem with I.R.C. § 446(e)). See Huffman, 126 T.C. at 350–51. In any event, in contrast to Evans, there can be no dispute that Mr. Greiner is a sophisticated taxpayer who, ahead of his election in 2004 and again in 2007, was explicitly advised that he had options in terms of reporting and should seek independent tax advice. In sum, instead of seeking to correct a mathematical, clerical, or other inadvertent error, the Greiners seek to "correct" an alleged substantive error(s) in the application of tax law to fact; however, as explained earlier, consent is plainly required even if a taxpayer purports to change from an impermissible method to a permissible one. See, e.g., Treas. Reg. § 1.446-1(e)(2)(i) and (iii) (Examples (1), (6), (7), and (8); Diebold, 16 Cl. Ct. at 202.

The Greiners also seek to invoke the second exception to § 446(e), contending that the government's "change in method" argument must fail because there is no "specific material item" that is reported inconsistently in different tax years. Pls.' Opp'n 3–4. From the Greiners' perspective, "there are three separate and distinct types or elements of income related to the earn-out right," and "each is [its own] specific material item of income for tax accounting purposes." Id. at 5. According to the Greiners, the first "material item" is "Mr. Greiner's in-kind receipt of the earn-out right from Boston Scientific in 2004, [allegedly] valued at $10 million and originally reported by [the Greiners] as an 'open' transaction." Id. at 6 (citing Greiner Decl. ¶¶ 23, 30, App. B-5–6). But see id. at 5 (asserting that, "[s]tanding alone, a contract right is not 'income' and the earn-out right itself cannot be the relevant 'item' of income."). Second, there are "the payments Boston Scientific made to Mr. Greiner in 2006 and 2007 pursuant to the earn-out right." Id. at 6 (citing Greiner Decl. ¶¶ 32, 33, App. B-6–7). Third, there are "the [final payments] made to Mr. Greiner in 2008 and 2009 pursuant to the litigation settlement reached in 2007." Id. (citing Greiner Decl. ¶¶ 38–40, App. B-7–8). Thus,

because the items are each allegedly separate and distinct, the Greiners contend that their treatment of one item should not limit their treatment of another.  Id. at 3–4, 6–7.

In support, the Greiners principally cite the Tax Court's decision in Capital One Financial Corporation v. Commissioner, for the principle that an "item" of income is to be strictly and narrowly construed.  See Pls.' Opp'n 5–6 (discussing Capital One, 130 T.C. at 159, 170).  Indeed, the Greiners contend that Capital One and other authorities allegedly make "granular distinctions between different types or components of income to give rise to different 'items' for tax accounting purposes."  Id. at 5–6 & 6 n.5.  Whether true or not, the Greiners overstate the relevance of the Capital One decision to this court's assessment of "item[s]" of income at issue in this case.  This court agrees with the Tax Court that "[w]hether an item is material," for purposes of § 446(e), "is a question of timing, but before determining materiality we must know which item to address."  130 T.C. at 159.  This court further agrees that "[w]hether particular income is an 'item' under section 1.446-1(e), Income Tax Regs., depends on all the facts and circumstances surrounding that income."  Id. at 161.

But the "items" of income at issue in Capital One bear an insignificant relation to the "item(s)" of income before this court; as such, Capital One is easily distinguishable on the facts.  As explained by the Fourth Circuit in its affirmance of the Tax Court, plaintiff credit card companies earned a variety of fees associated with their lending services:  late fees, overlimit fees, interchange fees, and cash advance fees.  659 F.3d at 319.  Seven years after Capital One filed its 1998 and 1999 returns, the company sought to change its accounting method for late fees because doing so would substantially reduce its taxable income on those 1998 and 1999 returns.  Id. at 321, 322.  The IRS conceded that, as a general matter, credit card companies may account for late fees in the manner proposed in Capital One's amended returns; nevertheless, Capital One was not permitted to retroactively switch to the new approach without consent.  Id. at 322.  The Capital One decision, however, says nothing about earn-out rights or earn-out payments, or proposed shifts between open and closed transaction approaches.  Moreover, the earn-out right and subsequent payments at issue before this court are far more closely related than the late fees in Capital One were related to other credit card fees and interest that arose in varying contexts.  Here, the earn-out right and earn-out payments are between the same payor and payee, stem from the same merger agreement, and all hinge on the value assigned by the parties to the same four Advanced Bionics products.

The Greiners' further reliance on La Crosse Footwear, Inc. v. United States, 191 F.3d 1372, 1379 (Fed. Cir. 1999), Kohler Co. v. United States, 34 Fed. Cl. 379, 384–85 (1995), and Hamilton Industries, Inc. v. Commissioner, 97 T.C. 120, 138–39 (1991), see Pls.' Opp'n 6 n.5, is also misplaced.  As the government points out, in La Crosse the issue was not whether the taxpayer changed method of accounting in violation of § 446(e), but whether the taxpayer's method of accounting for an item clearly reflected income as required by § 446(a) and (b).  See Def.'s Reply 8.  The taxpayer was

accounting for income on its bargain-priced inventory in the same pool as income from its inventory acquired at fair market value. 191 F.3d at 1375. The Federal Circuit held that the Commissioner was within its discretion to conclude that this accounting method had the effect of shielding gain from bargain-priced purchases from taxation. Id. at 1376, 1379. Thus, the approach did not clearly reflect income on the bargain-priced inventory. Id. at 1379. Taxpayer was required to treat subsequently-acquired inventory in separate pools. Id. Similarly, in Kohler Co. v. United States, the Federal Circuit also supported the Commissioner's conclusion that the taxpayer failed to reflect income when it treated reduced price inventory as the same "item" type as subsequently manufactured and otherwise identical goods. 124 F.3d at 1456–58. Cf. Hamilton, 97 T.C. at 139 n.6 (finding that the "[c]reation of a new item for tax accounting purposes on the basis of differences in cost characteristics is required only where necessary to clearly reflect income, and the issue is to be resolved on a case-by-case basis"). Here, in contrast, there is no allegation or evidence that either the open or the closed transaction approaches failed to reflect income clearly. Furthermore, there is no allegation or evidence that the 2008 and 2009 payments reflected either a premium or a bargain on the value of the earn-out right relative to the earlier 2006 and 2007 payments. To the contrary, all of the payments appear to have been tied to the estimated and evolving fair market value of the four Advanced Bionics products that were the subject of the earn-out right. Thus, the court is not convinced that three separate and distinct items of earn-out income are at issue in this case.

Third, the Greiners argue that their amended returns do not alter the tax years of the 2008 and 2009 final payments; thus, their attempt to re-categorize those payments as capital gain in lieu of ordinary income does not affect the timing of that income and, by extension, cannot reflect a change in method of accounting. See Pls.' Opp'n 4. This argument misses the mark because it obscures the full scope of the changes sought in the Greiners' amended returns. As the Greiners candidly explained in the narratives included with their amended returns for tax years 2008 and 2009, they are also seeking to modify their 2004 reporting (albeit constructively) to recognize, for the first time, $10 million in ordinary income associated with their original receipt of the earn-out right—income that was never reported on their original 2004 return. App. B-348–51, 386–89. Moreover, they must do so in order to lay the proper foundation for capital gains treatment of the 2008 and 2009 payments. Id. As the Greiners concede, the normative rules of taxing capital assets under I.R.C. §§ 1001, 1221, and 1222, apply only after the compensation element is closed under I.R.C. § 83. See Pls.' Opp'n 18 (citing I.R.S. Field Serv. Advice TL-N-995-94 (Feb. 2, 1995) ("After the compensation element is closed under section 83, the normal rules for taxing capital assets under sections 1001, 1221 and 1222 apply to the disposition of the share of stock acquired pursuant to the option's exercise."). Closing the 2004 transaction, which involves changing the income timing of the 2004 earn-out right, is therefore a necessary predicate to the Greiners' ability to hold a "capital asset" that could be later "sold or exchanged" for long-term capital gain. See id. Thus, as the government acknowledges and this court agrees, the possibility that the 2008 and

2009 payments might "constitute a discrete item of income for purposes of section 446(e) would have merit if [receipt of the earn-out right] had actually been reported in 2004." Def.'s Reply 7.  "However, that is manifestly not what plaintiffs elected to do."  Id. Accordingly, the court cannot ignore the direct relationship between the earn-out right and the subsequent payments made in 2006, 2007, 2008, and 2009, or the fact that they all stem from the Merger Agreement, as amended.  Likewise, the court cannot consider in isolation the proposed re-characterization of the 2008 and 2009 final payments as some mere adjustment of income category.  The Greiners' amended returns do seek, and must seek, to change the timing of income originally reported on the earn-out right as well.

The Greiners' fourth argument invokes the change in underlying facts exception to the consent rule under Treasury Regulation § 1.446-1(e)(2)(ii)(b).  See Pls.' Opp'n 7 n.7. "Even if an open transaction method were adopted for all manner of 'income' connected to the earn-out right (including receipt of the earn-out right itself)," the Greiners argue, "[they] would not be required to seek permission to change that method with respect to [the 2008 and 2009 final payments]."  Id.  They reason that capital gains treatment of the "refund claims [are] driven by a fundamental, unexpected, change in underlying facts, i.e., termination of the earn-out right."  Id.  This purported change was the 2007 settlement and de-merger of the companies, which resulted in the "earn-out buyout" consideration and ultimately the 2008 and 2009 final payments to Mr. Greiner.  E.g., Tr. 31:18–32:17, 34:21–35:15, 39:1–40:14, 42:17–43:3, 44:7–14.

Had the Greiners originally reported the 2004 earn-out right as a closed transaction, the court might have considered whether the 2007 settlement was a change in underlying facts affording the Greiners the ability to re-characterize the 2008 and 2009 final payments as capital gain without seeking consent.  However, the Greiners never laid the requisite foundation by reporting the 2004 earn-out right as a closed transaction.  Nor can they do so now because the 2004 tax year closed years ago and is not before the court.  See Pls.' Mem. 12–13, 30 ("[T]he time period for the IRS to assess additional tax against Plaintiffs for the 2004 tax year has closed . . . .").

Without this foundation of closing the 2004 transaction under I.R.C. § 83, the normative rules for taxing capital assets under I.R.C. §§ 1001, 1221, and 1222, do not apply.  See Pls.' Opp'n 18 (conceding same).  Moreover, even if the Greiners were permitted to re-open their 2004 reporting at this late date, the proffered change in underlying facts occurred in 2007 and would only affect new income thereafter, not old income already reported.

In addition, the court ultimately agrees with the government that the "earn-out buyout consideration" in the form of the 2008 and 2009 final payments was not the kind of change in the conduct of business that typically triggers the change in underlying circumstances exception.  See, e.g., Treas. Reg. § 1.446-1(e)(2)(iii) (Examples 3 and 4); Morris-Poston Coal Co. v. Comm'r, 42 F.2d 620, 621–22 (6th Cir. 1930) (finding that taxpayer was not required to obtain consent before switching from a combination of cash

and accrual methods in bookkeeping to accounting on a pure cash basis because he had "vitally changed the character of his business and created income of a nature never before entered on the books"); Decision, Inc. v. Comm'r, 47 T.C. 58, 64 (1966) (finding taxpayer's underlying change in business policies and procedures did not amount to change in method of accounting and thus did not require consent), acq., 1967-2 C.B. 1. Accordingly, the Greiners cannot avail themselves of the "change in underlying facts" exception.

Lastly, the Greiners assert that their proposed amendments do not contravene any public policy underlying the consent requirement. Pls.' Opp'n 9. For example, to the extent "transparency" is a goal, "it is noteworthy that in filing their refund claims [the Greiners] went so far as to include IRS Form 8275 Disclosure Statements, specifically flagging capital gain treatment of the [2008 and 2009 final payments] for scrutiny by the IRS." Id. (citing App. B-340–41 (Form 8275 for 2008), 384–85 (Form 8275 for 2009)). "Having been alerted to the issue by [the Greiners], the IRS then took nearly two years to review the refund claims but could not come to any conclusion about them." Id. "Thus," the Greiners argue, "the IRS had a full opportunity to review all issues raised by the refund claims and the Government should not now be heard to invoke the 'chameleon qualities' of the method of accounting rules to deny those claims." Id. (footnote omitted).

This is not entirely accurate. Unlike what occurred in this case, when a taxpayer openly invokes § 446(e) to seek a "change in method of accounting," companion I.R.C. § 481 allows the IRS to make such "adjustments" "in computing the taxpayer's taxable income" as are "necessary . . . to prevent amounts from being duplicated or omitted" because of the change in method. I.R.C. § 481(a). Notably, the IRS may reach back to assess the effect of the change on prior tax years—even prior tax years that are otherwise closed—and then to true up, in the year of the change, prior inconsistent treatment if the change results in income distortion over a multi-year period. See Cameron Iron Works, Inc. v. United States, 621 F.2d 406, 410-411 (Ct. Cl. 1980); Graff Chevrolet Co. v. Campbell, 343 F.2d 568, 570 (5th Cir. 1965). This ensures that the change in method does not result in a net loss of tax revenue. See Korn Indus., Inc. v. United States, 532 F.2d 1352, 1354 (Ct. Cl. 1976); see also Anderson Columbia Co. v. United States, 54 Fed. Cl. 756, 758 (2002) (analyzing whether § 481 adjustment to prior return warranted additional taxes and, if tax had not been properly paid, whether interest also was due "to compensate for the Government's loss of use of the money, irrespective of the reason for the late payment").

Thus, had the Greiners sought and been granted consent under § 446(e) for their proposed changes, the IRS would have had the opportunity under § 481 to re-open closed tax years 2004 through 2007 to root out and adjust for income distortions, if any. For example, the IRS could have re-assessed the 2004 tax year and determined that the estimated fair market value of the earn-out right in 2004 was not $10 million, as proffered by the Greiners herein, but rather much more or much less. This re-assessment, in turn,

would have affected the ordinary income tax that the IRS determined, through adjustment, should have been paid in 2004, in an amount more or less than the Greiners' unilateral assessment underlying their amended returns.  This adjustment to 2004, in turn, would have had a rippling effect on the taxes owed by the Greiners in 2006 through 2009, causing adjustments in those years as well as, ultimately, bringing into question the propriety of the claimed refunds.

In this case, however, the Greiners filed their amended returns without seeking consent under § 446(e) on the theory that there was no change in method of accounting and § 481 would not apply.  See Korn Indus., 532 F.2d at 1354 ("Unless [there has been a change in method of accounting,] Sec. 481 does not come into play."); accord Graff, 343 F.2d at 570.  The IRS, therefore, did not have the "full opportunity to review all issues raised by the refund claims," as argued by the Greiners.  See Pls.' Opp'n 9.  The IRS's need to assess ramifications of the Greiners' proposed change in method is obvious.  The Greiners arrived at the amount of their refund claims by retroactively re-assessing reportable income in the closed 2004 tax year to reflect an additional $10 million in ordinary income not previously reported, as well as a return of basis in the closed 2006 and 2007 tax years.  These modifications are based on the Greiners' unilateral assessment of the then-fair market value of the earn-out right in 2004.  And, as the government has argued, this "unilateral change that covers past years [and] that's based on [the taxpayers' unilateral] understanding of what their income [was] over the past few years[,] is precisely the type of change that would undermine the purpose of the consent rule."  Tr. 20:16–21.

As the Federal Circuit has explained, "Section 446(e) prohibits taxpayers from unilaterally amending their tax returns simply because they have discovered that a different method of accounting yields a lower tax liability than the method they originally chose."  Diebold, 891 F.2d at 1583.  In Diebold, the taxpayer "had consistently accounted for [ATM machine replacement parts] as inventory during the tax years in question, and then sought, by way of amended returns, to treat them as depreciable assets without having filed the required Form 3115 to request the Commissioner's consent to the change."  Id. at 1581.  Similarly, here, the Greiners had consistently accounted for receipt of the earn-out right through receipt of the earn-out income under the open transaction method of accounting only to seek, by way of their amended returns, to follow a closed transaction approach and ultimately claim capital gain without consent of the Commissioner.

The court agrees with the government that permitting the Greiners to amend their returns in this manner, and without consent, "would be granting them"—and all other taxpayers in analogous circumstances—"a license to freely change from one reporting treatment of their earn-out rights to another"—or more generally, between open and closed methods of accounting—"when hindsight shows it might be financially advantageous to do so."  See Def.'s Mem. 16.  In this case, "[g]iven the fully-disclosed

risks associated with the earn-out rights, it is understandable that a reasonable taxpayer would not elect to pay tax on $10 million of 'phantom' income in 2004, especially in light of the risk that no earn-out payments would ever be made." Id.  "Regardless of the reason," however, "the mere fact that plaintiffs decided on the open treatment and filed tax returns consistent with that position for many years is the operative fact." Id.  It might have been more advantageous if they had been able to estimate the fair market value of the right in 2004, report it and pay taxes on it that year. Id. at 17.  However, "[t]his is precisely the type of post hoc change which violates the purpose of section 446(e) and renders the statutory consent requirement necessary." Id. at 17.

Rather than granting taxpayers such unfettered freedom and unilateral decision-making, Congress instead vested the Commissioner with the authority "to determine whether a change in a taxpayer's method of accounting results in the omission of items from income or in the doubling or 'bunching' of deductions or exclusions and to make compensating adjustments." Diebold, 891 F.2d at 1583 (discussing I.R.C. § 446(e)). Congress' rationale and the importance of the consent rule are succinctly explained in the Claims Court's Diebold decision, later affirmed by the Federal Circuit:

> [A] central policy underlying the consent requirement is that the Commissioner should have an opportunity to review consent requests in advance.  With advance notice, the Commissioner has leverage to protect the fisc, to avoid burdensome administrative uncertainties, and to promote accounting uniformity.  If taxpayers generally were permitted to change accounting methods unilaterally, the Commissioner would face the enormous administrative burden of detecting changes and reviewing the propriety of each switch without ready leverage to protect the fisc or promote uniformity.

16 Cl. Ct. at 208; accord Capital One, 659 F.3d at 322 (quoting Diebold, 16 Cl. Ct. at 208); Rankin v. Comm'r, 138 F.3d 1286, 1287 (9th Cir. 1998)); Evans, T.C. Memo. 1988-228 (1988) (citing authorities in multiple jurisdictions).  Permitting unilateral changes, the Supreme Court explains, also "would operate to enlarge the statutory period for filing returns . . . .  There is nothing to suggest that Congress intended to permit a taxpayer, after expiration of the time within which return is made, to have his tax liability computed and settled according to [another] method." Cummins Engine Co., Inc. v. United States, 923 F.2d 826, 829–30 (Fed. Cir. 1991) (quoting Pacific Nat'l Co., 304 U.S. at 194–95).  Instead, the consent requirement further affords the Commissioner the ability to "condition[] consent on the taxpayer's agreement to make correcting adjustments in his income tax payments." Capital One, 659 F.3d at 322 (citing Witte, 513 F.2d at 394).  "The law thus requires what common sense would suggest." Id.

In contrast, if unilateral "retroactive change" were permitted, it "would become the exclusive tool of those seeking to reduce taxable income; 'uniformity in accounting would become a function of financial advantage and the administrative difficulties of

detecting unwarranted unilateral changes would be multiplied.'" Id. at 322–23 (quoting FPL Grp., Inc. v. Comm'r, 115 T.C. 554, 574 (2000)).  In this instance specifically, a finding in favor of the Greiners could open the floodgates to companies seeking to "game the system," id. at 327, by delaying reporting under an open transaction approach, only to later insist they knew or should have known to have closed the transaction when it would result in more favorable tax treatment in hindsight.

In sum, the Greiners elected to report their earn-out income pursuant to the open transaction method of accounting authorized in Burnet v. Logan by the United States Supreme Court.  Having elected this approach, they were bound to continue employing it absent the IRS's consent to a change.  They never sought or obtained such consent.  See Montgomery Decl. ¶¶ 4–5, App. A-18–19.  Thus, their attempt to retroactively amend their approach to reflect closed transaction reporting and subsequent capital gain was an impermissible change in method of accounting in violation of I.R.C. § 446(e).

B.      Duty of Consistency & Capital Gains Treatment

As the government prevails on its first defense based on I.R.C. § 446(e), the court need not reach the merits of the government's other two threshold defenses:  (i) that the Greiners' amended returns purportedly violate the common-law duty of consistency they owe the IRS; and (ii) that the Greiners are not entitled to capital gains treatment because there has been no "sale or exchange" of a "capital asset."

III.    Conclusion

The Greiners' claims for refund are based on an impermissible change in method of accounting within the meaning of I.R.C. § 446(e) and Treasury Regulation § 1.446-1(e).  Accordingly, it is **ORDERED** that:

(1) Defendant's Cross-Motion for Summary Judgment, filed January 7, 2015, ECF No. 25, is **GRANTED**;

(2) Plaintiffs' Motion for Summary Judgment, filed November 21, 2014, ECF No. 22, is **DENIED** as moot; and

(3) The Clerk of the Court shall enter judgment accordingly.

IT IS SO ORDERED.

 s/ Patricia Campbell-Smith
PATRICIA CAMPBELL-SMITH
Chief Judge